UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS E. DIAZ,

     Plaintiff,

vs.

CITY OF INKSTER,

     Defendant.

_____/

Civil Action No.
05-CV-70423-DT

HON. BERNARD A. FRIEDMAN

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 27)
## and
## GRANTING PLAINTIFF'S MOTION TO AMEND COMPLAINT (DKT. NO. 26)

     This matter is presently before the Court on (1) Defendant's Motion for Summary Judgment and (2) Plaintiff's Motion to Amend Complaint. Thomas Diaz ("Plaintiff") is an Hispanic law-enforcement officer for the City of Inkster ("Defendant"). He alleges that Defendant racially discriminated against him, by favoring black applicants, when it did not promote him to the positions of Chief of Police, Deputy Chief of Police, or Commander. Defendant denies any racial discrimination in its hiring and promotion decisions.

     The Court has reviewed the pleadings, motions and evidentiary documents in this case. Pursuant to E.D. Mich. LR 7.1(e)(2), the Court shall decide the motions without oral argument. The Court will deny Defendant's Motion for Summary Judgment and grant Plaintiff's Motion to Amend Complaint.

## I.  HISTORY OF THE CASE

A.       **FACTUAL BACKGROUND**

Plaintiff was hired as a patrolman with the Inkster Police Department in 1989.  (Pl.'s Am. Compl. ¶ 11; Def.'s Br. Supp. Mot. Summ. J., 2.)  In the 1990s, he received disciplinary action for illegal entry into a motel room and for improper lunch usage.  (Def.'s Br. Supp. Mot., Ex. A at 28-29.)  In 1999, Plaintiff was promoted to Road Patrol Sergeant.[1]  (Pl.'s Am. Compl. ¶ 12; Def.'s Br. Supp. Mot. Summ. J., 3.)  After Plaintiff's promotion, the police department had three black sergeants, three white sergeants, and one Hispanic sergeant (Plaintiff).  (Def.'s Br. Supp. Mot. Summ. J., Ex. A at 38-39.)  In 2003, Plaintiff was promoted to Lieutenant.  (Pl.'s Am. Compl. ¶ 12.)

In mid-May 2003, Police Chief Terry Colwell ("Colwell"), a white male, retired.  (Id. ¶ 14; Def.'s Br. Supp. Mot. Summ. J., 3.)  Deputy Chief Phillip Ludos ("Ludos"), a white male, became the interim Police Chief.[2]  (Pl.'s Am. Compl. ¶ 15; Def.'s Br. Supp. Mot. Summ. J., 3.)  Defendant named Plaintiff as Administrative Lieutenant and second in command.  (Pl.'s Am. Compl. ¶ 16; Def.'s Br. Supp. Mot. Summ. J., 3.)  In late May 2003, Ludos resigned.[3]  (Pl.'s Am. Compl. ¶ 18.)

---

[1]Plaintiff had to pass a test in order to be promoted.  Plaintiff stated that his score was the third highest in the group, but it was lower than the scores of Kenneth Brown and Gregory Hill. Both Brown and Hill are black.  Even though Brown received the top score, only Plaintiff and Hill were promoted to the position of Road Patrol Sergeant.  Plaintiff explained that he was promoted because of his "work ethic and merit."  (Def.'s Br. Supp. Mot. Summ. J., Ex. A at 34-35.)  Plaintiff stated that he was also told that Brown was not promoted because he "was a disciplinary problem."  (Id. Ex. A at 35-36.)

[2]Ludos had been hired as Deputy Chief about three-and-a-half years earlier.  (Id. Ex. B at 9, 55.)

[3]In June 2003, Ludos became the Chief of Police in Cocoa, Florida.  (Pl.'s Resp., Ex. B at 3.)

In June 2003, Plaintiff was named as interim Police Chief (Id. ¶ 19); however, one week later, Marvin Winkler ("Winkler"), a black male, was named as the new Police Chief.[4] (Id. ¶ 23; Def.'s Br. Supp. Mot. Summ. J., 4.)  In late June 2003, Gregory Gaskin ("Gaskin"), a black male, was named as Deputy Chief.  (Pl.'s Am. Compl. ¶ 26; Def.'s Br. Supp. Mot. Summ. J., 4.) At that time, Plaintiff stated that his title then changed from Administrative Lieutenant back to Lieutenant.  (Pl.'s Resp., Ex. A at 46.)

In April 2004, Aaron Peacock ("Peacock"), a white male, was named to the newly created position of Commander.  (Pl.'s Am. Compl. ¶ 30; Def.'s Br. Supp. Mot. Summ. J., 5.)  In July 2004, Peacock left the police department in order to go to law school, and Defendant promoted Gregory Hill ("Hill"), a black male, to be Commander.  (Pl.'s Am. Compl. ¶ 31; Pl.'s Resp., 9; Def.'s Answer ¶ 31.)

Currently, Defendant states that the command staff at the police department is comprised of five whites, four blacks, and one Hispanic.[5]  (Def.'s Br. Supp. Mot. Summ. J., 5.)  From 1998 to 2003, Robert Gordon ("Gordon") was Defendant's City Manager.  (Id. Ex. B at 4-5.)

## B.  PROCEDURAL HISTORY

---

[4]Before being hired by Defendant, Winkler had worked at the Detroit Police Department for nearly 30 years.  (Def.'s Br. Supp. Mot. Summ. J., Ex. C at 8.)

[5]The command staff currently includes: Police Chief Gregory Gaskin (black); Commander Gregory Hill (black); Detective Lieutenant Kevin Smith (white); Plaintiff (Hispanic); Lieutenant Jeffrey Smith (white); Lieutenant Barry O'Brien (white); Sergeant Kenneth Brown (black); Sergeant Paul Martin (white); Sergeant Scott Rechtzijel (white); Administrative Sergeant Lashawn Smithon (black).  (Id. at 5.)

Plaintiff's Motion to Amend indicates that the Deputy Chief position was recently filled; however, no further information was provided to the Court about the selected candidate's race.

In December 2004, Plaintiff filed a Complaint in Wayne County Circuit Court. Defendant then removed the case to this Court. Plaintiff amended his Complaint on February 28, 2005. Defendant filed an Answer.

On March 28, 2006, Plaintiff filed a Motion to Amend (First Amended) Complaint. Defendant filed a Response.

On March 30, 2006, Defendant filed a Motion for Summary Judgment. Plaintiff filed a Response. Defendant filed a Reply.

In May 2006, the Court adjourned the motion hearings that had been scheduled for June 2006.

## II.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). When reviewing a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A "genuine" issue is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

The court must view all of the evidence in the record, as well as any reasonable inferences from that evidence, in the light most favorable to the nonmoving party. Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  This favorable light, though, does not mean that a plaintiff can defeat a defendant's motion for summary judgment simply by showing "the mere existence of a scintilla of evidence in support of the plaintiff's position." Anderson, 477 U.S. at 252.  In other words, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 257.

## B.    COUNT 1 (42 U.S.C. § 1983)

Title 42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2003).  A sufficient claim for a violation of Section 1983 must show that: "(1) a person, (2) acting under the color of state law, (3) deprived him of a federal right." Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 614 (6th Cir. 2003).  The United States Supreme Court has held that municipalities and local governments are considered "persons" under Section 1983, so they can therefore be liable for constitutional deprivations.  Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 690 (1978).

Municipal liability for constitutional deprivations can arise "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy, inflicts the injury that the government as an entity

is responsible under § 1983." Id. at 694.  A municipal government, though, cannot be held liable

solely on the basis of a respondeat superior theory.  Id. at 691.  See also Bd. of County Commr's

v. Brown, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable

under a theory of *respondeat superior*.") In other words, a city government is not liable for

"every misdeed of [its] employees and agents."  Garner v. Memphis Police Dep't, 8 F.3d 358,

363 (6th Cir. 1993).  A city government is only liable when the custom or policy is the "moving

force" behind the deprivation of plaintiff's constitutional rights.[6]  Monell, 436 U.S. at 694.  In

order to show such "moving force" liability under Section 1983, the Sixth Circuit has ruled that a

plaintiff must "(1) identify the municipal policy or custom, (2) connect the policy [or custom] to

the municipality, and (3) show that his particular injury was incurred due to execution of that

policy [or custom]."  Turner v. City of Taylor, 412 F.3d 629, 639 (6th Cir. 2005) (quoting Alkire

v. Irving, 330 F.3d 802, 815 (6th Cir. 2003)).  Thus, the municipal government itself must be the

*cause* of the constitutional violation.

Here, Plaintiff alleges that Defendant violated his constitutional rights because of its

municipal custom.  Plaintiff asserts that Defendant practiced an "informal policy extending

---

[6]In Brown, 520 U.S. at 404, the United States Supreme Court elaborated on the meaning
of "moving force":

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct
> properly attributable to the municipality.  The plaintiff must also
> demonstrate that, through its *deliberate* conduct, the municipality
> was the "moving force" behind the injury alleged.  That is, a
> plaintiff must show that the municipal action was taken with the
> requisite degree of culpability and must demonstrate a direct
> causal link between the municipal action and the deprivation of
> federal rights.

.

preferential treatment based on race in promotions."  (Pl.'s Am. Compl. ¶ 35.)  While a "policy" is often a formal or expressly stated rule or regulation,[7] an informal policy—"custom"—"is a legal institution that is permanent and established, but is *not authorized by written law*." Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir. 1993) (emphasis added).  In order to create municipal liability based on custom, the "custom must be 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" Id. (quoting Monell, 436 U.S. at 691).  For instance, a city government "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  Monell, 436 U.S. at 690-91.  In such a case, the plaintiff must show that "the relevant practice is so widespread as to have the force of law."  Brown, 520 U.S. at 404.

In the case at hand, Plaintiff asserts that Defendant's custom "constitute[s] a denial of Plaintiff's right to equal protection of the laws as guaranteed by the 14th Amendment."  (Pl.'s Am. Compl. ¶ 35.)  The Sixth Circuit has instructed that "[i]n order to establish an equal protection violation against a public employer in a section 1983 action, a plaintiff must show that the employer made an adverse employment decision 'with a discriminatory intent and purpose.'" Boger v. Wayne County, 950 F.2d 316, 324-25 (6th Cir. 1991) (quoting Charles v. Baesler, 910 F.2d 1349, 1356-57 (6th Cir. 1990)).  The Sixth Circuit has further "held that a plaintiff in a section 1983 equal protection case must do more than just introduce evidence of discriminatory

---

[7]The Supreme Court has explained that an "'official policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time."  Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986) (plurality opinion).

7

intent and suggest that 'such intent could have played a role in an adverse employment decision. Rather, a plaintiff is required to demonstrate that the adverse employment decision would not have been made 'but for' [his race].'" Id. at 325 (quoting Gutzwiller v. Fenik, 860 F.2d 1317, 1325 (6th Cir. 1988)). Therefore, a Section 1983 plaintiff must not only prove the existence of a *municipal custom* of racial discrimination and demonstrate that the custom was *casually connected* to the adverse employment action, the plaintiff must also show the existence of *discriminatory intent and purpose*.

### 1. Police Chief Winkler

Plaintiff alleges that when Defendant hired Winkler—a black male—as its Police Chief, Defendant was acting pursuant to a racially discriminatory municipal custom in hiring and promotion. Plaintiff provides an affidavit from a former City of Inkster councilwoman, Louise Kolberg ("Kolberg"), to support his allegations. In her affidavit, Kolberg stated the following:

> 4. Between the time that former Inkster Police Chief Terry Colwell retired and the hiring of former Inkster Police Chief Marvin Winkler, Jr. ("Winkler"), I overheard a conversation between Councilwoman Deartriss Richardson ("Richardson") and Councilman Earnest Hendricks ("Hendricks").
> 5. During that conversation, Richardson and Hendricks both stated that they wanted a black Chief of Police because the City of Inkster was predominantly black.
> 6. Richardson and Hendricks are black.
> 7. During that same time period, I met with former Inkster City Manager Robert Gordon in his office.
> 8. Gordon informed me he was under pressure from certain City Council members and Mayor Hilliard Hampton ("Hampton") as to what they wanted in the next Chief of Police.
> 9. Gordon and Hampton are black.
> . . . .
> 12. When Council was first informed of the arrival of Winkler, it was also informed that Winkler was bringing someone with him to fill the position of Deputy Chief.
> 13. After a meeting of the Council, I witnessed Hampton and a

8

> black citizen scream at each other in the hallway.
> 14.     Hampton also poked the citizen in the stomach.
> 15.     When I later chastised Hampton for being unprofessional, he told me:
>> a. I would not understand.
>> b. That was the way "black folks" talked to one another.

(Pl.'s Resp., Ex. C.)

The Court finds Kolberg's statements are not sufficient proof of a municipal custom. The alleged overheard conversation between the council members only shows that two of the members on the council may have hoped that the next Police Chief would be black. Kolberg's statement falls short of showing a council-wide custom of racial discrimination in hiring and promotion. The council members' personal preferences or opinions do not equate to official municipal views, nor do such statements establish a "relevant practice [that] is so widespread as to have the force of law." Brown, 520 U.S. at 404. The alleged overheard conversation was merely chit-chat between two people, not a "permanent and well settled" custom that was pervasive throughout City government. In fact, if anything, Kolberg's affidavit—in which she stated that the council members were aware that Winkler already had a person in mind for Deputy Chief—disproves Plaintiff's claim of a municipal predisposition or plan to only promote blacks. This is because Kolberg's statement shows that *Defendant did not play a role* in the selection of Deputy Chief.

Next, in the eighth paragraph of her affidavit, Kolberg stated that Gordon told her that he was under pressure from certain council members and the mayor about "what they wanted in the next Chief of Police." The Court does not find such a vague statement to demonstrate a custom of racial discrimination. Kolberg did not indicate what Gordon meant when he made the alleged statement of "what they wanted." For instance, Kolberg did not state that Gordon mentioned

9

anything about race to her, or that he further explained his statement of "what they wanted." Also, the Court finds that Kolberg's statements—about seeing the mayor "scream" and jokingly "poke" another black citizen in the hallway—fail to show a prevalent and widespread custom of racial discrimination in hiring and promotion. Therefore, Kolberg's affidavit is not sufficient evidence to demonstrate a municipal custom.

In addition, Plaintiff provides an inter-office, background-check memorandum, sent by Gordon, on which someone had written "White Male," "Black Male," or "American Indian Male," next to each of the applicants' names for the position of Police Chief. (Pl.'s Resp., Ex. H.) The memorandum also indicated each applicant's address, driver license number, date of birth, and social security number.[8] While former Police Chief Ludos stated that race was not needed to do a background check (Id. Ex. B at 38-39), Gordon stated that race was often provided for a background check on a job applicant, (Def.'s Br. Supp. Mot. Summ. J., Ex. B at 28-29.) Furthermore, it should be noted that no one seems to know who actually wrote the racial background information on the memorandum.

The Court finds that the memorandum does not demonstrate a custom so "widespread as to have the force of law." The information included in the background-check memorandum dealt with *each* applicant's background characteristics—name, address, driver license number, social security number, and race. The situation may have been different had the memorandum only contained racial categories and no other information about the Police Chief candidates. The situation would surely have been different if the memorandum included only one specific racial

---

[8]Much of the applicants' personal information seems to have since been "whited-out" for inclusion as Exhibit H in Plaintiff's Response.

10

category—for instance, if only "black male" had been scribbled by the names of the black candidates, or if only the white candidates had been marked as "white male." In the case at hand, though, *all* relevant background information is included, as the memorandum's very purpose is a background check of each job applicant. Therefore, the Court finds that the memorandum fails to demonstrate both the existence of a racially discriminatory municipal custom or that such an alleged custom was the "moving force" behind the hiring of Winkler as Police Chief.

In fact, the evidence seems to support that Defendant was fair-minded in its hiring and promotion. Plaintiff himself stated that, in 1999, he was promoted to sergeant because of his "work ethic and merit," even though a black applicant had scored better on the evaluation exam. After Plaintiff's promotion, the police department had more non-black sergeants than black sergeants. Further, the two police chiefs before Winkler were both white—Colwell and Ludos.[9]

_____

[9]Ludos, a white male, stated that he selected 23 employees during his three-and-a-half years with the police department. Ludos stated that 71% of those employees were minority or female candidates. He further stated that of that 71%, more than 50% were black. Ludos also explained that, at the time of his hiring, he told the City Council and Gordon that he would work to diversify the population of the police department. (Def.'s Br. Supp. Mot. Summ. J., Ex. B at 9, 55.)

Plaintiff asserts that the hiring percentages and Ludos's statements show a municipal custom of racial discrimination against non-blacks. The Court finds no such showing. First, Ludos himself is white. Defendant hired Ludos as Deputy Chief and promoted him to interim Police Chief. Second, Ludos's statement to the City about trying to diversify the department does not demonstrate a municipal custom of racial discrimination. If anything, such a statement is indicative of a City that has not been discriminating against non-blacks in its hiring and promotion.

Lastly, the hiring percentages are not sufficient evidence of an unconstitutional municipal custom. Ludos stated that more than half of the 71% minority/female candidates hired were black. This means that more than 35.5% of the hired candidates were black. This seems not at all surprising because, as Ludos indicated, the City of Inkster is about 72% black and 28% white. (Pl.'s Resp., Ex. B at 83.) It seems more than likely that there were many more black applicants than non-black applicants in the first place. Moreover, Plaintiff provides no statistical evidence

11

Lastly—and even more indicative of the *non-existence* of any racially discriminatory municipal custom of hiring and promotion—Defendant states that the current command staff at the police department is comprised of five whites, one Hispanic, and four blacks. Thus, there are more non-blacks on the command staff than blacks. The Court finds that such employment data does not show a discriminatory municipal custom.

Although the Court finds that Kolberg's affidavit, the background-check memorandum, and the hiring percentages do not demonstrate a racially discriminatory municipal custom, the Court does find that Plaintiff presents one piece of direct evidence. The deposition testimony of Lieutenant Kevin Smith ("Smith"), when taken in the light most favorable to Plaintiff, could subject Defendant to municipal liability. Smith stated that Gordon told him that the next Police Chief would be black. Smith further stated that Gordon told him that there were some "members on the council that wanted a black chief" and "when [Police Chief] Colwell retired, you can bet the next chief is going to be black." (Pl.'s Resp., Ex. D at 14-15.)

While a municipality cannot be liable on a theory of respondeat superior, a municipality

_____

about the number of black and non-black candidates to apply for the jobs. Such evidence would have provided the Court with an opportunity to examine the number of blacks and non-blacks who applied, in relation to the number of blacks and non-blacks who were actually hired.

In addition, Plaintiff argues that a discriminatory custom is also demonstrated by the fact that Gordon, during his years as City Manager, hired no non-black candidates as department heads. (Pl.'s Resp., Ex. E at 42.)

The Court disagrees. Gordon stated that he hired only four or five department heads during his years as City Manager. (Id. Ex. E at 40.) The fact that Gordon hired four or five black candidates—to fill department-head positions such as Police Chief, Public Service Director, etc.—does not demonstrate a prevalent, widespread custom of racial animus against non-black applicants. Such data only shows that approximately one black department head was hired each year. Furthermore, as above, Plaintiff provides no statistical data about the race of the job applicants for those department-head positions, so as to allow a comparison between the racial makeup of the applicant pool and those actually hired.

can be held liable under Section 1983 for a single unconstitutional action, as long as the municipal employee whose action creates the municipal liability has the final authority to establish a municipal policy or custom.  Pembaur, 475 U.S. at 481.  See also Feliciano, 988 F.2d at 655 (stating "the municipality is liable for an official's unconstitutional action only when the official is the one who has the 'final authority to establish municipal policy with respect to the action ordered'") (quoting Pembaur, 475 U.S. at 481).

Here, Gordon is the final decision maker when it comes to hiring a Police Chief.  Gordon stated that according to the City's charter, the "City Manager hired all department heads," which includes the position of Police Chief.  (Def.'s Br. Supp. Mot. Summ. J., Ex. B at 6.)  Therefore, Gordon's employment decision to hire a police chief, and his relevant statements, can be seen as the "execution of a government's policy or custom" because Gordon's "edicts or acts may fairly be said to represent official policy," and thus he "inflicts the injury that the government as an entity is responsible under § 1983."  Monell, 436 U.S. at 694.  In other words, Gordon's statement and employment action could be imputed to Defendant because Gordon has the final authority with respect to the hiring of a police chief.  Therefore, when taken in the light most favorable to Plaintiff, the hiring of the police chief may have been an unconstitutional action that would subject Defendant to municipal liability under Section1983.

### 2.   Deputy Chief Gaskin and Commander Hill

Plaintiff asserts that a racially discriminatory municipal custom also motivated the selections of Gaskin (a black male) as deputy chief and Gregory Hill (a black male) as commander.  The Court disagrees.

Gordon stated that Winkler was given authority to hire his own deputy chief and

13

commander, (Def.'s Br. Supp. Mot. Summ. J., Ex. B at 6), and that he did not influence Winkler's selections, (Id. at 23). However, Gordon admitted that ultimately he maintained the final authority over who was selected to fill those positions. (Id. at 50.) In other words, Winkler only had discretion—albeit quite broad discretion—to select the candidates. Such discretionary authority does not generate municipal liability. The Sixth Circuit has held that "[m]ere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable." Feliciano, 988 F.2d at 655. Here, Winkler's employment decisions were reviewable by Gordon. Moreover, the Eastern District of Michigan has found that the "Circuit Courts of Appeal have similarly held that a municipality cannot be liable under Section 1983 for the discretionary employment decisions made by its police chief." Nelson v. City of Flint, 136 F.Supp.2d 703, 718 (E.D. Mich. 2001). Thus, Winkler's discretionary decisions do not amount to a municipal custom.

Even so, Plaintiff fails to show that a discriminatory municipal custom was the "moving force" behind the selection of Gaskin as deputy chief and Hill as commander. Winkler first tried to hire Pierre Fortier as deputy chief. Fortier is a *white* male. He had been one of Winkler's colleagues at the Detroit Police Department for nearly 30 years. (Def.'s Br. Supp. Mot. Summ. J., Ex. C at 19-20.) Winkler offered him the job, but Fortier turned it down. (Id.) Gaskin, a black male, was Winkler's second choice. Winkler explained his reasons for hiring Gaskin: "I had worked with him [Gaskin] before. I knew that he had some accounting skills which I thought would come in handy with some of the things that I had in mind to do with the police department. . . . And I was comfortable working with him." (Id. Ex. C at 20-21.) As such, Plaintiff shows neither that a municipal custom of racial discrimination existed, nor that such a

14

custom was the "moving force" behind the hiring of Gaskin as deputy chief, nor that discriminatory intent or purpose existed.

As for the Commander position, Winkler first hired Peacock, a *white* male.  Winkler explained that he selected Peacock because "he was qualified for the position"; "[h]e had the right kind of attitude"; "he was a team player"; "[h]e had goals and objectives of the organization on board"; and "he was trustworthy."[10]  (Id. Ex. C at 30.)  It was only when Peacock left that Winkler selected Hill, a black male, to fill the position.  As above, the Court finds Plaintiff has shown neither the existence of a discriminatory custom, nor that such a custom was the "moving force" behind the selection of Hill, nor the existence of discriminatory intent.

In sum, the Court finds that Plaintiff has demonstrated—barely—a genuine factual issue as to whether a discriminatory municipal custom was the "moving force" behind the selection of Winkler for the position of police chief.  However, Plaintiff has failed to demonstrate any such municipal liability as to Defendant's selection of its deputy chief or commander.  Therefore, Defendant may potentially be liable under Section 1983 only in regard to its selection of Winkler over Plaintiff for its police chief.

**B.      COUNT II (42 U.S.C. § 1981) AND COUNT III (ELLIOTT-LARSEN CIVIL RIGHTS ACT)**

Title 42 U.S.C. § 1981 states:

> (a) Statement of equal rights
>      All persons within the jurisdiction of the United States shall
> have the same right in every State and Territory to make and

---

[10]Winkler explained that Peacock was hired, even though he hoped to go to law school, because "the deputy chief and I [Winkler] were going to try to talk him out of leavin' and go to law school up here."  (Def.'s Br. Supp. Mot. Summ. J., Ex. C at 30.)  It seems that Peacock had been accepted at both a local law school and an out-of-state law school.

> enforce contracts, to sue, be parties, give evidence, and to the full
> and equal benefit of all laws and proceedings for the security of
> persons and property as is enjoyed by white citizens . . . .

42 U.S.C. § 1981(a) (2003).  Thus, Section 1981 "prohibits intentional race discrimination in the

making and enforcing of contracts."  Amini v. Oberlin College, 440 F.3d 350, 358 (6th Cir.

2006).  In the case at hand, Plaintiff contends that "Defendant's promotional policies deny

Plaintiff his right to enter into employment contracts guaranteed by 42 U.S.C. § 1981."  (Pl.'s

Am. Compl. ¶ 43.)

Michigan's Elliott-Larsen Civil Rights Act, MCL § 37.2101 et seq., states:

> (1) An employer shall not do any of the following:
>    (a)  Fail or refuse to hire or recruit, discharge, or otherwise
> discriminate against an individual with repsect to employment . . .
> because of religion, race, color, national origin, age, sex, height,
> weight, or marital status.

MCL § 37.2202(a)(1) (2001).  In the case at hand, Plaintiff contends that Defendant violated

Michigan law because Plaintiff "has been discriminated against on the basis of his race."  (Pl.'s

Am. Compl. ¶ 47.)

The same race-discrimination framework can be used to examine both Plaintiff's Section

1981 and Elliott-Larsen claims.  The Sixth Circuit has explained that both types of claims call

for the same race-discrimination analysis as is conducted under Title VII of the Civil Rights Act,

42 U.S.C. § 2000e et seq.  See Sutherland, 344 F.3d at 614 n.4 (stating "[c]laims under

Michigan's Elliott-Larsen Civil Rights Act involve the same analysis as Title VII claims");

Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 n.2 (6th Cir. 2000) (stating the "standards for Title

VII are equally applicable to [plaintiff's] claims under 42 U.S.C. § 1981"); Mitchell v. Toledo

Hosp., 964 F.2d 577, 582 (6th Cir. 1992) (stating the "McDonnell Douglas/Burdine formula is

16

the evidentiary framework applicable not only to claims brought under Title VII, but also to claims under . . . 42 U.S.C. § 1981") (citations omitted).  Therefore, all of Plaintiff's claims can be examined together.

A plaintiff can "establish a prima facie case . . . for racial discrimination by introducing direct evidence of discrimination or by using the *McDonnell-Douglas[/Burdine]* burden-shifting paradigm" (for indirect or circumstantial evidence).  Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 561 (6th Cir. 2004).  Direct evidence of racial discrimination is only that evidence where "a racial motivation is explicitly expressed." Amini, 440 F.3d at 359.  As for indirect evidence, the United States Supreme Court has explained the applicable burden-shifting framework.  The Supreme Court instructs that the plaintiff "must carry the initial burden . . . of establishing a prima facie case of racial discrimination."  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the plaintiff establishes a prima facie case, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  Id.  If the defendant meets its burden, the "plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

### 1.  Police Chief Winkler

Here, as set forth above, Plaintiff presents a thread of direct evidence of racial discrimination concerning the hiring of Winkler as police chief.  Smith stated that Gordon told him that the next police chief would be black.  Smith further stated that Gordon told him that there were some "members on the council that wanted a black chief" and "when [Police Chief] Colwell retired, you can bet the next chief is going to be black."  (Pl.'s Resp., Ex. D at 14-15.)

17

Gordon's statements are direct evidence of racial discrimination. The Sixth Circuit has held that "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003). For instance, the Sixth Circuit has explained that "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). Here, Gordon is the decision maker. His discriminatory statements—expressly stating race as the determinative factor in an employment decision—are exactly those types of statements considered to be direct evidence of discrimination.

Plaintiff's presentation of direct evidence means that the burden-shifting paradigm (for indirect evidence) does not apply. The Supreme Court has held that "the *McDonnell Douglas[/Burdine]* test is inapplicable where the plaintiff presents direct evidence of discrimination." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985). Nonetheless, it should be noted that both Winkler and Plaintiff seemed qualified for the position of police chief, although Winkler seemed much more qualified. Winkler had worked for nearly 30 years at the Detroit Police Department. (Def.'s Br. Supp. Mot. Summ. J., Ex. C at 8.) Although Plaintiff had held a variety of positions within the Inkster Police Department, (Pl.'s Am. Compl. ¶ 33), he had only been employed by Defendant for approximately 15 years. Winkler had both a bachelor's degree and a master's degree. (Id. Ex. C at 3-6.). While Plaintiff had an associate's degree in political science and criminal justice, (Pl.'s Resp., Ex. A at 9), he was still working toward earning his bachelor's degree, (Id. Ex. A at 10). Also, Plaintiff had

18

received positive feedback from his colleagues. For instance, Ludos stated that, at the time of hiring for police chief, he told Gordon that "Diaz [Plaintiff] is the only person that's in your organization currently that can do this [position of police chief]."[11] (Id. Ex. B at 25.)

Although the United States Supreme Court has instructed that the Title VII analysis was "not intended to diminish traditional management prerogatives," Burdine, 450 U.S. at 259 (quotations omitted), and although the Court seeks to avoid interfering with business-judgment decisions, the Court finds that a genuine issue of material fact exists as to Defendant's selection of Winkler as its police chief. Plaintiff has provided direct evidence that, when taken in the light most favorable to Plaintiff, indicates the existence of racial discrimination in Defendant's selection of Winkler over Plaintiff. The credibility of Plaintiff's claim is to be determined by a factfinder, not by the Court at this stage of the proceedings.

### 2. Deputy Chief Gaskin and Commander Hill

Plaintiff fails to introduce direct evidence of racial discrimination in regard to the hiring of Gaskin as deputy chief and the promotion of Hill as commander. As set forth above, Plaintiff's evidence, in regard to Gaskin and Hill, does not demonstrate statements or actions that are facially discriminatory. Thus, Plaintiff's evidence about the employment decisions for deputy chief and commander do not rise to the level of direct evidence.

However, even though Plaintiff fails to provide sufficient direct evidence of racial discrimination, he can still seek to establish racial discrimination by indirect evidence. In such a case, the burden-shifting McDonnell Douglas/Burdine paradigm applies. A plaintiff can establish

---

[11]It should be noted that Ludos's comment only indicates his belief as to Plaintiff's qualifications relative to the other members of the police department. His comment draws no comparison as to Plaintiff's qualifications relative to outside candidates, such as Winkler.

"a *prima facie* claim of racial discrimination based on a failure to promote" by showing that: "(1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions." Dews, 231 F.3d at 1020-21 (footnote omitted).

Plaintiff, though, frames his allegations as "reverse discrimination" claims.[12]  For a "reverse discrimination" claim, the Sixth Circuit has modified the traditional prongs of the prima-facie case. Sutherland, 344 F.3d at 614.  The Sixth Circuit has held that the first prong is only satisfied if the plaintiff demonstrates "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." Id. (quotations and citations omitted). See also Boger, 950 F.2d at 325 (stating same). Furthermore, the Sixth Circuit has held that the fourth prong is only satisfied if the plaintiff demonstrates that "the defendant treated differently employees who were similarly situated but were not members of the protected class." Sutherland, 344 F.3d at 614.

The Sixth Circuit has explained that to demonstrate employees are "similarly situated" requires "the plaintiff [to] show that the 'comparables' are similarly-situated *in all respects*." Mitchell, 964 F.2d at 583.  The Sixth Circuit has further explained that "in all respects" means that a plaintiff must show that "all of the *relevant* aspects of his employment situation were

---

[12]Although Plaintiff is Hispanic, and therefore a member of a racial minority, he seems to consider himself as a "white" person.  For instance, he often presents his allegations in terms of only "black" and "white" racial categories, and he includes himself in the "white" category. Thus, because he asserts that Defendant violated his constitutional rights by favoring blacks, the Court will treat his discrimination claim as a "reverse discrimination" claim—even though a "reverse discrimination" claim is defined as "a claim by a white person that the employer discriminated in favor of a member of a racial minority." Boger, 950 F.2d at 325.

'nearly identical' to those of [the black applicant's] employment situation." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (quotations and citation omitted). In other words, "similarly situated" individuals cannot have "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell, 964 F.2d at 583.

Here, Plaintiff satisfies the second and third prongs of the prima facie case—he was apparently qualified for the positions but was denied promotion. Plaintiff was a veteran of the Inkster Police Department and had already received several promotions. In fact, Gaskin himself mentioned that "Tom [Plaintiff] would be a good candidate" for the position of deputy chief. (Pl.'s Resp., Ex. F at 7.) In the end, though, Plaintiff was not selected—an adverse employment action—for either position. Thus, Plaintiff satisfies the second and third prongs of the prima facie case.

Plaintiff similarly satisfies the first prong, for he has demonstrated "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority," Sutherland, 344 F.3d at 614 (quotations and citation omitted). Although the racial composition of the police department's personnel seems to be well balanced, as set forth above, there still remains the explicitly racial statements by Gordon. His facially discriminatory statements qualify as "background circumstances" sufficient to raise the "suspicion" that Defendant is that "unusual employer who discriminates against the majority." Thus, Plaintiff satisfies the first prong of the prima facie case.

As for the fourth prong—differential treatment of similarly situated candidates—Plaintiff only demonstrates that he was similarly situated in *all relevant employment aspects* to Hill, but not to Gaskin. Gaskin, who was selected as deputy chief, was one of Winkler's colleagues from

21

the Detroit Police Department for nearly 30 years.  (Def.'s Br. Supp. Mot. Summ. J., Ex. C at 18, 20.)  Winkler and Gaskin knew each other well, and Winkler was already very comfortable with Gaskin.  This longtime relationship certainly differentiated Gaskin and Plaintiff in their bids to become deputy chief.  As such, Gaskin's and Plaintiff's employment situations were not "nearly identical" in all "relevant aspects."  Thus, Plaintiff and Gaskin were not similarly situated, and Plaintiff fails to satisfy the fourth prong of the prima facie case as to the hiring of Gaskin as deputy chief.

However, Plaintiff and Hill were similarly situated.  Hill, who was selected as commander, had been employed by Defendant for approximately 23 years and had held a variety of positions within the police department.  (Id. Ex. F at 2.)  Similarly, Plaintiff had been employed for approximately 15 years and had also held a variety of positions within the police department.  Like Plaintiff, Hill was working on earning his bachelor's degree.  (Id. Ex. F at 1.)  Both Plaintiff and Hill had received disciplinary actions in the past.  (Pl.'s Resp., Ex. F at 36.)  Thus, the Court concludes that Plaintiff and Hill could be considered similarly situated.  As such, Plaintiff satisfies the fourth prong of the prima facie case in regard to the promotion of Hill as commander.

As Plaintiff has presented a prima facie case of racial discrimination regarding the selection of Hill, the burden then shifts to Defendant to present a "legitimate, nondiscriminatory reason" for its employment decision.  McDonnell Douglas, 411 U.S. at 802.  The United States Supreme Court has instructed that "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Burdine, 450 U.S. at 254.  Moreover, the Supreme Court has explained that the "defendant need not persuade the court that it was actually motivated by the proffered reasons."  Id.

Here, Defendant provides legitimate reasons for the selection of Hill as commander.[13] Winkler stated that Hill was chosen over Plaintiff because Hill was "more of a team player." (Id. Ex. C at 34-35.) Further, it seemed that then-Deputy Chief Gaskin and Plaintiff did not get along well with each other. For instance, when asked if he had consistently argued with Gaskin, Plaintiff stated: "Oh absolutely. We've had disagreements." (Id., Ex. A at 53.) In fact, Plaintiff stated that he has had nine arguments with Gaskin. (Id. Ex. A at 53-75.) Moreover, Gaskin stated that "[t]here were some issues with Thomas [Plaintiff] as far as Tom's loyalty; as far as Tom being able to keep confidential matters confidential." (Pl.'s Resp., Ex. F at 14.) Thus, the Court finds that Defendant provided legitimate, nondiscriminatory reasons for its selection of Hill to fill the position of commander.

The burden now shifts back to Plaintiff. At this point, Plaintiff must show that "the proffered reason was not the true reason for the employment decision." Burdine, 450 U.S. at 256. The Sixth Circuit has explained that a "plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews, 231 F.3d at 1021.

---

[13]Even if the Court were to assume that Plaintiff had also stated a prima facie case of discrimination for Defendant's selection of Gaskin, Plaintiff would still fail to satisfy the McDonnell Douglas/Burdine paradigm because Defendant provided legitimate, nondiscriminatory reasons for hiring Gaskin. Winkler personally selected Gaskin as Deputy Chief because the two had worked together for a long time at the Detroit Police Department. They therefore had established a good relationship and were comfortable working together. Winkler also stated that he thought Gaskin's "accounting background" would be "extremely helpful" to the police department and to the programs he hoped to implement. (Def.'s Br. Supp. Mot. Summ. J., Ex. C at 21.) Furthermore, Plaintiff failed to produce sufficient evidence to reasonably suggest that such legitimate reasons were actually pretext for discrimination.

Here, Plaintiff has presented evidence, when taken in the light most favorable to Plaintiff, that raises a genuine issue of material fact about whether Defendant's proffered reasons did actually motivate its promotion of Hill, instead of Plaintiff, to the position of commander.  First, Gaskin stated that "it would be a good idea" to hire more blacks in order to make the police department more reflective of the local area.  (Pl.'s Resp., Ex. F at 51-52.)  Second, Gaskin admitted that when Hill was hired, he was aware that Hill had been removed from the Narcotics Department because Hill had allowed a murder suspect to drive his vehicle.  (Id. Ex. F at 34; Ex. D at 46-48.)  Third, Gaskin stated that another officer had brought to his attention that Hill had allegedly released prisoners for money.  (Id. Ex. F at 32-33, 59.)  Gaskin apparently let the matter drop when that officer did not report back with more information.  Lastly, Hill had previously failed two evaluation exams.  Based on such evidence, a reasonable jury could find that Defendant's proffered reasons—Hill was more of a "team player" and Plaintiff had "loyalty" issues—for its employment decision were not its actual motivation in its selection of Hill.  Thus, Plaintiff provides sufficient indirect evidence to satisfy the McDonnell Douglas/Burdine paradigm in regard to Hill's promotion, over Plaintiff, to be commander.

## III.    PLAINTIFF'S MOTION TO AMEND COMPLAINT

Plaintiff has filed a Motion to Amend Complaint pursuant to Federal Rule of Civil Procedure 15(d).  Rule 15(d) states that "[u]pon motion of a party the court may . . . permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."  FED. R. CIV. P. 15(d).  Plaintiff argues that the Court should allow a Second Amended Complaint because, while this case was pending, Plaintiff applied for the position of deputy chief but was not promoted.

24

Plaintiff claims that Defendant's rejection was in retaliation for his filing of the current lawsuit. Plaintiff seeks to add two retaliation claims, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and under Michigan's Elliott-Larsen Civil Rights Act, MCL § 37.2101 *et seq.*

The Court will allow the Complaint to be amended. Rule 15(d) is "intended to give the court *broad discretion* in allowing a supplemental pleading." FED. R. CIV. P. 15(d) advisory committee's note (emphasis added). The Court finds that allowing the amended Complaint serves the Court's strong judicial interest in "reducing multiplicity of litigation by permitting as many of the claims between the parties as possible to be settled in one action." 6A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1506 (2d ed. 1990). Thus, the Court will grant Plaintiff's Motion to Amend Complaint.

## IV.   CONCLUSION

For the reasons stated above, the Court finds that there exists a genuine issue of material fact as to whether a municipal custom of racial discrimination, under Section 1983, was the "moving force" behind Defendant's hiring of Gaskin, and rejection of Plaintiff, as police chief. In addition, as to Plaintiff's Section 1981 and Elliott-Larsen claims, the Court finds genuine issues of material fact in regard to Defendant's hiring of Winkler as police chief—based on direct evidence—and as to Defendant's promotion of Hill to be commander—based on indirect evidence. Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment is denied.


IT IS FURTHER ORDERED that Plaintiff's Motion to Amend Complaint is

granted.



_____s/Bernard A. Friedman_____
BERNARD A. FRIEDMAN
CHIEF UNITED STATES DISTRICT JUDGE

Dated: August 2, 2006
         Detroit, Michigan

I hereby certify that a copy of the foregoing document
was served this date upon counsel of record
electronically and/or via first-class mail.


_____/s/ Patricia Foster Hommel_____
        Patricia Foster Hommel
    Secretary to Chief Judge Friedman

26